IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| ANTHONY J. HAMPTON ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 21-2010 |
| ) | |
| BAKERY, CONFECTIONARY & ) | |
| TOBACCO WORKERS AND GRAIN ) | |
| MILLERS INTERNATIONAL UNION ) | |
| OF AMERICA, LOCAL 218, AFL-CIO, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

## COMPLAINT

The plaintiff, Anthony J. Hampton, states and alleges the following claims for relief against the defendant, Bakery, Confectionary & Tobacco Workers and Grain Millers International Union of America, Local 218, AFL-CIO (hereinafter "the Union").

## JURISDICTION AND VENUE

1. This is an employment case based upon and arising under 42 U.S.C. § 1981, and the Labor Management Relations Act of 1947, 29 U.S.C. § 185.

2. This court has subject matter jurisdiction over the plaintiff's claims pursuant to 28 U.S.C. § 1331.

3. All of the wrongful acts and practices alleged below were committed within the State of Kansas, and venue is proper in this court pursuant to 28 U.S.C. § 1391(b)-(c).

## PARTIES

4. The plaintiff, Anthony J. Hampton, is African American, and he resides in McKinney, Texas. Mr. Hampton was employed as a production employee by Frito-Lay, Inc., for over eight years. Frito-Lay owns and operates a food manufacturing plant in Topeka, Kansas.

5. The defendant the Union is a "labor organization" within the meaning of 29 U.S.C. § 185, and it is the exclusive bargaining agent for the production and maintenance employees of Frito-Lay's plant in Topeka.

## FACTUAL ALLEGATIONS

6. In June of 2010, Mr. Hampton was hired by Frito-Lay to work in its Topeka plant. During his employment, Mr. Hampton worked in several departments in Frito-Lay's Topeka plant; in 2018, Mr. Hampton was working in the Receiving Department.

7. In February of 2018, George "Sam" Kistler began coming to the office of the Receiving Department, where Mr. Hampton worked. Mr. Kistler is employed in the Maintenance Department in Frito-Lay's Topeka plant, and he had no work-related reason to visit the office of the Receiving Department. By the spring of 2018, Mr. Kistler was visiting the office of the Receiving Department two (2) to six (6) times per week.

8. During his frequent visits to the office of the Receiving Department, Mr. Kistler expressed offensive and inflammatory comments and opinions to Mr. Hampton, or in Mr. Hampton's presence. The comments and opinions expressed by Mr. Kistler related to a variety of topics, including race, Mr. Kistler's ownership of guns, and his service in the military. The comments and opinions expressed by Mr. Kistler created a racially intimidating, hostile, and offensive work environment for Mr. Hampton.

9. On October 5, 2018, Mr. Kistler make another one of his unwelcome visits to the Receiving office. Mr. Hampton opened the door leading out of the Receiving office, and asked Mr. Kistler to leave. Mr. Kistler responded that he wasn't scared of Mr. Hampton. Mr. Hampton replied that he didn't want Mr. Kistler to be scared of him, he just wanted Mr. Kistler to leave. As Mr. Kistler was leaving the Receiving office, he asked Mr. Hampton if he was going to "rat out" Mr. Kistler. Mr. Hampton responded that he wouldn't have to do that, because Mr. Kistler's managers already knew about his unwelcome visits to the Receiving office. At no time during this incident did Mr. Hampton threaten or strike Mr. Kistler.

10. Toward the end of his shift on October 5, 2018, Mr. Hampton informed Ryan McGivern of the incident between Mr. Hampton and Mr. Kistler. Mr. McGivern was then a manager over the Receiving Department.

11. On October 6, 2018, Mr. Hampton prepared a written "Statement of Events," which described the history of Mr. Kistler's unwelcome visits to the Receiving office, and the incident between Mr. Hampton and Mr. Kistler on October 5, 2018. Mr. Hampton delivered copies of his written statement to Mr. McGivern, and to Laura Blythe, who was then the Human Resources Director at Frito-Lay's Topeka plant. In his statement, Mr. Hampton asserted that during the incident with Mr. Kistler, "[a]t no time did I threaten or strike Sam." In the last paragraph of his statement, Mr. Hampton further asserted:

> I am prepared to seek relief and protection(s) from Shawnee County District Courts. Sam [Kistler] is a gun owner and has already expressed concern on whether or not I would 'rat him out.' Frito-Lay's policies haven't stopped

3

> him.  While at work, I'm concerned he will come in with a weapon.

12. On October 12, 2018, Mr. Hampton was informed by Mr. McGivern that he was being suspended from his employment by Frito-Lay, without pay, pending an investigation.  Mr. McGivern did not give Mr. Hampton any reason for his suspension.  Mr. Hampton filed a grievance contesting his suspension.

13. For a number of years, Frito-Lay and the Union had entered into a series of Collective Bargaining Agreements, which governed the relations between Frito-Lay, the Union, and the production and maintenance employees at Frito-Lay's plant in Topeka.  One of these Collective Bargaining Agreements (hereinafter "the CBA") was effective between September 16, 2017, and September 12, 2020.

14. Article 3 of the CBA prohibits discrimination by Frito-Lay or the Union.  Article 3 state in relevant part:

> The Company and the Union agree that they will not discriminate against any employee or prospective employee.  Frito-Lay is dedicated to the achievement of equality of opportunity for all of its associates and applicants for employment.  This broadly interpreted policy prohibits discrimination on the basis of race, color, religion, sex, sexual orientation, gender identity, age, national origin, disability, veteran status or any protected category under state, local or federal law.

15. Article 5 of the CBA states that Frito-Lay may make such rules and regulations as it may "deem best for the purposes of maintaining order, safety, and/or effective operations of its business, and . . . to require compliance therewith by employees."  Pursuant to Article 5 of the CBA, Frito-Lay has implemented the Topeka Plant Work Rules (hereinafter "Work Rules").  The Work Rules are designed to "define

and protect the rights, safety and welfare of all employees," and to "detail appropriate guidelines for addressing inappropriate conduct."

16. The Work Rules are divided into two sections. The first section sets forth examples of behavior for which an employee can be progressively disciplined through a four-step procedure up to termination. The second section provides examples of rule violations that could result in immediate termination from employment.

17. Article 11 of the CBA establishes a three-step grievance procedure for resolving any dispute involving application or interpretation of the CBA. If the dispute involves the termination of an employee, the first two steps are skipped, and the dispute progresses to the third step. The third step of the grievance procedure requires that a "Leadership Team member . . . shall . . . meet with the Chief Steward and the Local Union representative in an effort to resolve the dispute."

18. During October of 2018, the HR Department at the Topeka plant investigated the incident which had occurred on October 5 between Mr. Hampton and Mr. Kistler. This investigation was conducted primarily by Anthony Diers, who interviewed both Mr. Hampton and Mr. Kistler. During his investigation with Mr. Diers, Mr. Kistler claimed that on October 5, Mr. Hampton had used profanity toward him, and had made physical contact with him.

19. During his investigation, Mr. Diers also interviewed two of Mr. Hampton's co-workers in the Receiving Department: Devonta Jones and Karina Ramos-Aguirra. Both of these co-workers had witnessed the October 5 incident between Mr. Hampton and Mr. Kistler, and both of these co-workers eventually signed written statements regarding what they had observed.

20. On or about October 31, 2018, Mr. Diers prepared a report which summarized the results of his investigation in regard to the October 5 incident between Mr. Hampton and Mr. Kistler. Mr. Diers' report stated in relevant part:

> Based on these findings, this claim [by Mr. Kistler] is substantiated. 3 of the 4 individuals involved in the incident in question confirmed there was physical contact inflicted on Kistler by Hampton in the workplace. Working in lock-step with Legal and Labor, it was determined that – based on a zero-tolerance policy when it comes to physical altercations (workplace violence) – Hampton should be separated from the organization.

21. However, Mr. Diers' report further stated that a severance agreement would be offered to Mr. Hampton. The report explained:

> Given potential risk – as Hampton had no prior progressive discipline for performance, and given Hampton's being less than 9 months away from having access to his pension – it was determined to opt for a "severance" offer, wherein Hampton would not return to work, but would remain eligible for benefits until his 55th birthday, at which point he would have access to his pension, and would also effectively be totally separated from the organization. The Labor team has drafted a document, and once finalized the Topeka HR team will work with the union to present this document to Hampton.

22. On November 1, 2018, the HR Department at the Topeka plant offered Mr. Hampton, through the Union, a severance agreement, which was entitled "Confidential Transition Agreement and General Release" (hereinafter "Transition Agreement"). This Transition Agreement provided, in relevant part, that Mr. Hampton would not return to work at the Topeka plant, but he would remain eligible for employee benefits from Frito-Lay until his 55th birthday, at which point he would be eligible for his pension benefits.

23. Also on November 1, 2018, the Union made a written request for information from the HR Department at the Topeka plant in regard to the suspension of Mr. Hampton from his employment. This request for information included the following:

1. Copies of all written and verbal statements provided to or taken by the company, investigation notes taken and communication made by the company representatives during investigations related to Tony Hampton since May 1, 2018.

. . . .

5. Copies of any information not requested that was used to prepare the 'Confidential Transition Agreement and General Release' as presented to the suspended employee and the bargaining representative on November 1, 2018.

24. On November 13, 2018, Mr. Diers sent a letter to the Union in response to the Union's request for information regarding the suspension of Mr. Hampton. Mr. Diers attached to his letter "documents that we have collected which match your request." These documents included written statements signed by Mr. Jones and Ms. Ramos-Aguirra regarding the October 5 incident between Mr. Hampton and Mr. Kistler. These statements supported Mr. Kistler's allegation that on October 5, Mr. Hampton had used profanity toward him, and had made physical contact with him.

25. After receiving the documents from Mr. Diers on November 13, 2018, the Union failed to show Mr. Hampton the written statements signed by Mr. Jones and Ms. Ramos-Aguirra. The Union further failed to advise Mr. Hampton that these statements supported Mr. Kistler's allegation that on October 5, Mr. Hampton had used profanity toward him, and had made physical contact with him. As a result, Mr. Hampton

7

declined to accept the Transition Agreement which had been offered to him by Frito-Lay.

26. On November 28, 2018, Chris Emeish, who was then the Processing Manager at Frito-Lay's Topeka plant, sent a letter to Mr. Hampton, informing Mr. Hampton that he was being terminated from his employment by Frito-Lay. Mr. Emeish's letter stated in part:

> This letter is intended to inform you that your employment with Frito Lay, Inc. has been terminated effective immediately for violating the Topeka Plant Work Rules #11, 2nd set, and #15, 2nd Set.
>
> On October 5, 2018, you were involved in an incident with a fellow Frito-Lay Topeka employee. Upon investigating, it was determined that you had used profanity toward this team member, and used your person to physically contact this team member. These incidents are in violation of the…Topeka Plant Work Rules….

27. Mr. Hampton believed that the allegations in Mr. Emeish's letter of November 28, 2018, were false. Accordingly, Mr. Hampton filed a grievance contesting his termination.

28. On December 6, 2018, Mr. Hampton and his Union representatives met with Mr. Emeish to discuss Mr. Hampton's grievance over his termination. Mr. Hampton told Mr. Emeish that he did not have any physical contact with Mr. Kistler during the incident on October 5, 2018. Mr. Emeish stated that he would take Mr. Hampton's grievance under advisement.

29. On January 7, 2019, Mr. Emeish sent a letter to Mr. Hampton's Union representatives, denying Mr. Hampton's grievance regarding his termination. Mr. Emeish's letter stated in part:

8

> On 12/06/18, a 3rd Step Grievance meeting was held between the Company and Union with Tony Hampton present. Per the investigation after the 3rd step meeting referenced above, there were no subsequent findings to overturn the termination, therefore this grievance is denied. (Updated: 1/7/19)

The Union chose not to arbitrate Mr. Hampton's grievance over his termination.

30. Mr. Kistler was never disciplined in any significant way because of the incident between Mr. Hampton and Mr. Kistler on October 5, 2018. Mr. Kistler remains employed by Frito-Lay in its Topeka plant.

31. On September 12, 2019, Mr. Hampton filed an administrative charge against Frito-Lay with the Equal Employment Opportunity Commission (hereinafter "EEOC"), asserting that his discharge from employment was racially discriminatory. On September 25, 2019, that EEOC issued a right-to-sue letter to Mr. Hampton in regard his claim against Frito-Lay that his discharge from employment was racially discriminatory.

32. On November 14, 2019, Mr. Hampton (through his attorney) requested copies of all documents which the Union had received from Frito-Lay, in response to the Union's written request for information to Frito-Lay on November 1, 2018, regarding Mr. Hampton's suspension from employment. The Union refused to provide any documents to Mr. Hampton.

33. On December 23, 2019, Mr. Hampton filed a lawsuit in the United States District Court of Kansas against Frito-Lay and Mr. Kistler, Case No. 19-CV-2776, alleging racial discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. In the course of discovery in Case No. 19-CV-2776, Mr. Hampton served a subpoena on the Union, requesting copies of all

documents which the Union had received from Frito-Lay, in response to the Union's written request for information to Frito-Lay on November 1, 2018, regarding Mr. Hampton's suspension from employment.

34.   On July 13, 2020, Mr. Hampton received copies of the documents from the Union which were responsive to his subpoena in Case No. 19-CV-2776.  These documents included the written statements by Mr. Jones and Ms. Ramos-Aguirra regarding the incident on October 5, 2018, between Mr. Hampton and Mr. Kistler.  At this point in time, Mr. Hampton first learned or discovered that Mr. Jones and Ms. Ramos-Aguirra had both signed written statements which supported Mr. Kistler's allegation that on October 5, Mr. Hampton had used profanity toward him, and had made physical contact with him.

35.   In October of 2020, Mr. Hampton settled his claims of racial discrimination against Frito-Lay and Mr. Kistler, and Case No. 19-CV-2776 was eventually dismissed.

### COUNT I:  BREACH OF THE DUTY OF FAIR REPRESENTATION

36.   Paragraphs 1-35 above are incorporated herein by reference.

37.   The Union breached its duty of fair representation by representing Mr. Hampton in the grievance procedure in an arbitrary and racially discriminatory manner, and in bad faith.  Specifically, the Union failed to show Mr. Hampton the written statements by Mr. Jones and Ms. Ramos-Aguirra regarding the incident on October 5, 2018, between Mr. Hampton and Mr. Kistler; and further failed to advise Mr. Hampton that these statements supported Mr. Kistler's allegation that on October 5, Mr. Hampton had used profanity toward him, and had made physical contact with him.

38. The Union's breach of its duty of fair representation seriously undermined the integrity of the grievance procedure and the arbitral process. If the Union had not breached its duty of fair representation, Mr. Hampton would have agreed to sign the Transition Agreement which had been offered to him by Frito-Lay.

39. The Union's breach of its duty of fair representation has caused Mr. Hampton to sustain damages in the form of lost past and future pension benefits, plus other consequential damages.

Wherefore, Mr. Hampton prays for judgment against the Union in excess of $100,000.00, consisting of lost past and future pension benefits, attorney fees, prejudgment interest, litigation expenses, and costs.

### COUNT II: RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

40. Paragraphs 1-39 above are incorporated herein by reference.

41. The Union discriminated against Mr. Hampton because of his race by impairing his right to make and enforce a contract. Specifically, the Union discriminated against Mr. Hampton by failing to reasonably advise him that the written statements by both Mr. Jones and Ms. Ramos-Aguirra supported Mr. Kistler's allegation that on October 5, 2018, Mr. Hampton had used profanity toward him, and had made physical contract with him. The Union's discriminatory conduct caused Mr. Hampton to decline to sign the Transition Agreement which had been offered to him by Frito-Lay.

42. As a result of the Union's discriminatory conduct, Mr. Hampton has suffered damages in the form of lost past and future pension benefits to which he would have been entitled under the Transition Agreement. In addition, Mr. Hampton has also

suffered damages in the form of emotional distress, mental anguish, and loss of enjoyment of life.

43. In subjecting Mr. Hampton to racial discrimination, the Union acted with malice or with reckless indifference to Mr. Hampton's federal protected rights. Consequently, the Union is liable for punitive damages.

Wherefore, Mr. Hampton prays for judgment against the Union for damages in excess of $100,000.00, consisting of loss of past and future pension benefits, emotional distress, mental anguish, loss of enjoyment of life, and punitive damages, plus attorney fees, prejudgment interest, and litigation costs.

Respectfully Submitted,

SLOAN, EISENBARTH, GLASSMAN
McENTIRE & JARBOE, L.L.C.

BY: s/Alan V. Johnson
Alan V. Johnson, KS #9992
ajohnson@sloanlawfirm.com
534 South Kansas Avenue, Suite 1000
Topeka, Kansas 66603-3456
785-357-6311
785-357-0152 facsimile
Attorneys for Plaintiff

## **REQUEST FOR TRIAL BY JURY**

Pursuant to Fed. R. Civ. Pro. 38, the plaintiff requests a trial by jury on all claims triable to a jury.

        Respectfully Submitted,


        SLOAN, EISENBARTH, GLASSMAN
        McENTIRE & JARBOE, L.L.C.

        BY:   s/Alan V. Johnson
              Alan V. Johnson, KS #9992
              ajohnson@sloanlawfirm.com
              534 South Kansas Avenue, Suite 1000
              Topeka, Kansas 66603-3456
              785-357-6311
              785-357-0152 facsimile
              Attorneys for Plaintiff

## **DESIGNATION OF PLACE OF TRIAL**

The plaintiff requests that Kansas City, Kansas, be designated as the place of trial in the above-captioned matter.

                                  Respectfully Submitted,

                                  SLOAN, EISENBARTH, GLASSMAN
                                McENTIRE & JARBOE, L.L.C.

                                BY:   s/Alan V. Johnson
                                      Alan V. Johnson, KS #9992
                                      ajohnson@sloanlawfirm.com
                                      534 South Kansas Avenue, Suite 1000
                                      Topeka, Kansas 66603-3456
                                      785-357-6311
                                      785-357-0152 facsimile
                                      Attorneys for Plaintiffs